```
1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                          AUSTIN DIVISION

3  UNITED STATES OF AMERICA    ) Docket No. A 16-CR-347 SS
                               )
4  vs.                         ) Austin, Texas
                               )
5  EGHOSA BRIGHT OBARETIN (8)  )
   ROLAND IMEO (9)             ) February 21, 2017
6

7                  TRANSCRIPT OF DETENTION HEARING
                 BEFORE THE HONORABLE MARK P. LANE
8

9  APPEARANCES:

10 For the United States:       Mr. Michael C. Galdo
                                Assistant U.S. Attorney
11                              816 Congress Avenue, Suite 1000
                                Austin, Texas 78701
12

13 For Defendant Obaretin:      Mr. Michael J. Morris
                                Morris & Allen, PLLC
14                              299 West San Antonio Street
                                New Braunfels, Texas 78130
15

16 For Defendant Imoe:          Mr. H. Curtis Woodcock
                                316 West 12th Street, Suite 109
17                              Austin, Texas 78701

18

19 Transcriber:                 Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
20                              Austin, Texas 78701
                                (512)391-8792
21

22

23

24

25 Proceedings reported by electrical digital sound recording,
   transcript produced by computer.
```

1                           **I N D E X**

2                        <u>Direct</u>    <u>Cross</u>      <u>Redirect</u>  <u>Recross</u>
   <u>Witnesses:</u>

3

4   Adam Johnson        5          13,16      18        19

5   Queen Ifah          22         28,30

6

7                       **E X H I B I T S**

8                                              <u>Offered</u>    <u>Admitted</u>

9   <u>Government's</u>

10  #1 through 5                               9          9

11  #6 through 7                               9          10

12

13  <u>Defendant's</u>

14  (None.)

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:14 a.m.)

2          THE CLERK:  The Court calls Case 16-CR-347, United

3  States vs. Defendant No. 8, Eghosa Bright Obaretin.

4          MR. GALDO:  Michael Galdo on behalf of the United

5  States.

6          MR. MORRIS:  Michael Morris on behalf of Mr. Obaretin,

7  your Honor.

8          THE CLERK:  Defendant No. 9, Roland Imoe, for detention

9  hearing.

10          MR. GALDO:  Mike Galdo on behalf of the United States.

11          MR. WOODCOCK:  Curtis Woodcock on behalf of Mr. Imoe,

12  your Honor.

13          THE COURT:  All right.  Well, good morning to the

14  attorneys and good morning to you two gentlemen.

15          We are here for the purpose of what was originally an

16  arraignment, but I see that those have been entered in writing,

17  pleas of not guilty.  That leaves the issue of the government's

18  motion to detain.

19          Mr. Galdo, where are you with that motion?

20          MR. GALDO:  We've got one witness to present to the

21  Court.

22          THE COURT:  All right.  So you want --

23          MR. GALDO:  For both defendants.

24          THE COURT:  -- you want to proceed?

25          MR. GALDO:  Yes, your Honor.

```
 1              THE COURT:  All right.  Very good.  Call your witness.

 2              MR. GALDO:  Your Honor, the government calls Adam

 3  Johnson.

 4              THE COURT:  Mr. Johnson, if you'd make your way over

 5  here to this chair, we'll get started.  Initially raise your

 6  right hand, you'll be sworn by the clerk.

 7              (Witness sworn.)

 8              THE COURT:  Mr. Johnson, have a seat.  When you're

 9  comfortable, give us your full name and spell your last name,

10  please.

11              THE WITNESS:  Adam Johnson, J-O-H-N-S-O-N.

12              MR. GALDO:  Your Honor, I would just inquire if there

13  are any witnesses for the defense in the courtroom.

14              THE COURT:  Messrs. Morris and Woodcock, do you

15  anticipate calling any witnesses that are here?

16              MR. MORRIS:  Yes, your Honor.  I have three witnesses.

17  They are not knowledgeable about any of the facts regarding the

18  underlying indictment material.  They're merely here as character

19  witnesses regarding my client.

20              THE COURT:  But they're going to be subject to

21  cross-examination and he's going to be digging at them.  So if

22  you've got any witnesses, please ask them to step outside.

23              MR. MORRIS:  Will do, your Honor.  Thank you.

24              THE COURT:  Thank you.

25              MR. GALDO:  And, your Honor, interesting point, but I
```

```
 1   know we went through some of this last time we had a hearing on
 2   this case --
 3              THE COURT:  Yes.
 4              MR. GALDO:  -- for the role on witnesses and I did some
 5   case law work.  Case agents -- I guess I need to be clear the
 6   case agents are immune from the rule on witnesses, but we have to
 7   clarify that at the beginning of the hearing.  But we have no
 8   other witnesses besides Mr. Johnson.
 9              THE COURT:  Always appreciate the education, Mr. Galdo.
10   Thank you, sir.
11              MR. GALDO:  Thank you, your Honor.
12              THE COURT:  All right.  You may proceed.  Thank you,
13   Mr. Morris.
14              MR. MORRIS:  Yes, your Honor.
15         ADAM JOHNSON, called by the Government, duly sworn.
16                       DIRECT EXAMINATION
17   BY MR. GALDO:
18   Q.   Mr. Johnson, can you please tell the Court what your
19   occupation is?
20   A.   I'm employed as a special agent with Internal Revenue
21   Service Criminal Investigation here in Austin, Texas.
22   Q.   And how long have you been a special agent with IRS?
23   A.   Oh, about seven years now.
24   Q.   And what are your primary responsibilities?  What do you
25   work on?
```

1  A.   To investigate potential violations of Criminal Code, mostly

2  Sections 1826 and 31 dealing with financial crimes.

3  Q.   Do you also work on -- in concert with other agents and

4  agencies looking into wire fraud, money-laundering offenses like

5  that under Title 18?

6  A.   Yes, sir.

7  Q.   Are you participating and assisting in an investigation into

8  the case that brought these two defendants here today?

9  A.   Yes, I am.

10  Q.   And what is your role in that investigation?

11  A.   Primarily to assist in the financial aspect of the case,

12  reviewing bank records, getting the bank records from the banks

13  via subpoenas, and assisting the other agencies with everything

14  dealing with the case, the arrests, indictments.

15  Q.   You participate in search warrants and you've read other --

16  you've talked to the other agents involved in the case, as well,

17  too, correct?

18  A.   Yes, sir.

19  Q.   Okay.  And in the courtroom today, we have Roland Imoe and

20  Eghosa Bright Obaretin, correct, the two defendants?

21  A.   That's correct.

22  Q.   And they're seated to my left, your right, in the courtroom?

23  A.   Yes, sir.

24  Q.   Now, could you describe to the Court the -- they're both

25  charged with money laundering in this case.  Could you describe

1   to the Court what the money-laundering scheme was at issue here

2   that you uncovered as part of your investigation?

3   A.   Yes.  We were investigating the scheme which covered a

4   variety of scams.  An example would be a grandchild-in-jail

5   scheme, inheritance scheme, or even some romance schemes.  The

6   individuals in the courtroom today, those two defendants, opened

7   bank accounts locally, which were used to receive victim funds,

8   and then, they would, in turn, withdraw that money and get it

9   back to the orchestrators of the scams.

10  Q.   And you say the orchestrators.  Was this a one or two-person

11  thing?  How broad and widespread was this conspiracy?

12  A.   We know there's a number of players in this scheme.  To

13  date, I think -- I don't have an exact number, but willing to say

14  at least ten people were involved and that could grow.

15  Q.   And the funds would flow from here in Austin to other places

16  in the U.S. to out of the country, correct?

17  A.   That's correct.

18  Q.   And as part of your investigation, you've looked at dozens

19  of bank accounts, correct?

20  A.   Yes, sir.

21  Q.   And you talk about bank accounts being opened in this case.

22  How -- was there any particular way, especially talking about Mr.

23  Imoe and Mr. Obaretin, that bank accounts were opened?  Any kind

24  of tradecraft that was used in opening those accounts?

25  A.   Yes.  The accounts we've identified for these two defendants

1  were opened with counterfeit passports.

2  Q.   And by the -- what's the purpose of opening the account with

3  a counterfeit passport?

4  A.   To disguise the true ownership and nature of the banking

5  activity.

6  Q.   All right.  I've shown these to defense counsel before, your

7  Honor.  I'll do it again briefly.

8           THE COURT:  Sure.

9           MR. GALDO:  May I approach the witness, your Honor?

10          THE COURT:  Yes.  And you don't need my permission.

11 Q.   (BY MR. GALDO) All right.  Let's talk about 1.  I've handed

12 you seven exhibits.  Could you talk about -- look real quick at

13 what's been marked for identification as Government's 1 through

14 5.  Could you just take a quick look through those then, and tell

15 me what those are?

16 A.   Yes.

17 Q.   What are they?

18 A.   Government's Exhibits 1 through 5 -- Government Exhibit 1 is

19 a counterfeit Belgium passport in the name of David Smith, but it

20 bears a picture of Mr. Obaretin.

21          Government's Exhibits 2, 3, 4 and 5 are bank

22 surveillance images, taken of banking activity inside Bank of

23 America branches here locally.  And the photos appear to be Mr.

24 Obaretin making the transactions.

25 Q.   Right.  At this time, the government would move

1    Government's 1 through 5 into evidence.

2             THE COURT:  Any objection, gentlemen?

3             MR. MORRIS:  No objection, your Honor.

4             MR. WOODCOCK:  None, your Honor.

5             THE COURT:  All right.  They're admitted at least for

6    this hearing's purposes.

7             MR. GALDO:  Publish those to your Honor?

8             THE COURT:  Sure.

9    Q.   (BY MR. GALDO) While the Court's looking at 1 through 5 --

10            THE COURT:  Thanks.

11   Q.   (BY MR. GALDO) -- can you tell me what 6 and 7 are?

12   A.   Yes.  Government's Exhibits 6 and 7 are also bank

13   surveillance images taken from banks here locally of what appears

14   to be Mr. Imoe conducting financial transactions.

15   Q.   And what name was the account for -- that he's taking

16   pictures of accessing?

17   A.   Yes.  These transactions were taken under the bank account

18   under the name Frederick Johnson.

19   Q.   And was that opened with a fraudulent passport?

20   A.   Yes, it was.

21   Q.   Your Honor, the government would move into evidence for this

22   hearing Government's Exhibit 6 and 7.

23            MR. WOODCOCK:  No objection.

24            THE COURT:  Any objection, Mr. Morris?

25            MR. MORRIS:  No, your Honor.

1          THE COURT:  All right.  Six and 7 are admitted for

2     purposes of our hearing.

3          MR. GALDO:  Publish those.

4          THE COURT:  And just if I can get a clarification, as

5     it relates to these pictures of these finan -- or maybe you were

6     going to go into this, Mr. Galdo, what were these transactions?

7          MR. GALDO:  I will, your Honor.

8          THE COURT:  Okay.  All right.  Go ahead.

9     Q.   (BY MR. GALDO) And we talked about how they were opened with

10    a fake passport.  Were there any other steps?  You just go to the

11    bank?  Do you need a mailing address?  How does the fake passport

12    kind of facilitate the scam?  Could you explain that?

13    A.   Yeah.  The counterfeit passport would be received -- banks

14    require a proof of address, residence for the owner of the

15    account.  So in these instances, UPS mailboxes were opened also

16    with the counterfeit passports, and the address for the UPS

17    mailbox was used -- provided to the bank to receive, you know,

18    debit cards, other things related to the banking activity.

19    Q.   And so, the debit card would be sent to the UPS mailbox, and

20    then, Mr. Imoe or Mr. Obaretin would have a debit card and a bank

21    account to use, correct?

22    A.   That's correct.

23    Q.   And then, that bank account information would be -- how was

24    that used in the scam?  So there's a bank account.  How is it

25    used and relates to those photos, if you could explain that to

1   the Court.

2   A.   Yes, sir.  The bank account, once it was opened, would be

3   provided to the orchestrators of the fraud, scams, so that it

4   could be provided to the victims to make cash deposits, wire

5   transfers, and the victims would deposit money into these

6   counterfeit accounts.

7   Q.   And once the money is in, what are these photos of actually

8   occurring?

9   A.   These photos are of the defendants making withdrawals of

10  cash inside the bank.  Inside the bank branches.

11  Q.   And are those timed in any particular way?

12  A.   Timed, they're date-stamped just so the photos can show the

13  withdrawal activity within days of the victim money hitting the

14  accounts.

15  Q.   And for these two defendants, have you talked to HSI about

16  their -- let's talk about two things, travel and citizenship

17  status.  For travel, what's the travel like for these two

18  individuals?

19  A.   Yes.  I have spoken with HSI agents who are more familiar

20  with that aspect of the investigation.  I know both defendants

21  have recently traveled overseas and returned to the U.S. in

22  January of this year.  As far as their legal status here in the

23  country, I believe Mr. Imoe is a U.S. citizen.  Mr. Obaretin is a

24  legal permanent resident.

25  Q.   And potential consequences for legal permanent resident if

1    he's convicted of a federal money-laundering offense, according

2    to HSI, could be loss of status, correct?

3    A.    Correct.

4    Q.    A name that came up in the Pretrial Service report was Vera

5    Ikolo.  Is the last name Ikolo -- does that come up in this

6    investigation?

7    A.    Yes, it has.

8    Q.    And how has that name come up?

9    A.    A prior defendant related to this case was arrested in --

10   pled guilty related to similar conduct.

11   Q.    That was Augustine Ikolo?

12   A.    Augustine Ikolo, yes, sir.

13   Q.    And is Augustine Vera Ikolo's legal husband?  Well.

14   A.    That was what it -- initially it was made out to seem.

15   Although Mr. Ikolo, himself, has said that marriage was a sham.

16   Q.    And who connected him with Vera Ikolo?

17   A.    I believe it was one of the defendants, Mr. Imoe, that

18   connected Mr. Ikolo to Vera.

19   Q.    And did Mr. Imoe, himself, gain citizenship by marrying a

20   U.S. citizen who he subsequently divorced?

21   A.    I believe so.  Yes, sir.

22   Q.    Your Honor, I'll pass the witness.

23            THE COURT:  All right.  Messrs. Woodcock and Morris,

24   you may proceed if you have any questions that you have for the

25   agent.

```
1              MR. WOODCOCK:  Can I go first, your Honor?

2              THE COURT:  Of course.

3                        CROSS-EXAMINATION

4    BY MR. WOODCOCK:

5    Q.   Agent Johnson, my name is Curtis Woodcock.  I represent Mr.

6    Imoe.  I have just a few questions.

7              Specifically with what you've talked about at the end

8    there with respect to -- you said that you believe that Mr. Imoe

9    became a citizen through the marriage?  What information do you

10   have to substantiate that, I guess?

11   A.   Well, I believe I received -- I don't know the proper term,

12   but after the defendant was arrested last week, probation,

13   Pretrial Services does a report.

14   Q.   Uh-huh.

15   A.   And I have reviewed that report.  I'd have to see it to talk

16   specifically about his marriage and see what.

17   Q.   So the Pretrial Services report is what you're talking

18   about, the same one that the Judge, I'm assuming, has and I have?

19   Is that --

20   A.   I don't know the proper term or title.

21   Q.   Can I approach the --

22             THE COURT:  Sure.

23             MR. WOODCOCK:  -- witness, your Honor?

24   Q.   (BY MR. WOODCOCK) This is the report that I received.

25   A.   Yes.  Yes, sir.  That is the report that I was referencing.
```

1    Q.    Okay.  But, I mean, you'll agree I don't see anything in

2    this report that indicates he became a citizen by marriage.  It

3    says that he was married and has been divorced, but doesn't say

4    that's how he gained citizenship.  Is that correct?

5    A.    You're right.  Sir, it doesn't say that's how he became a

6    United States citizen.

7    Q.    So other -- so perhaps you misread it, which is fine.  But

8    other than that, you don't have any information that that was the

9    way that he became a citizen.

10   A.    Was through marriage.

11   Q.    Other than this -- what you -- the, I guess, misreading of

12   this report, you don't have any other information that the way

13   that he became a citizen was through marriage.

14   A.    Yes, sir.

15   Q.    Okay.  And there are several ways that someone can become a

16   citizen.  I'm sure you're aware of that.  I don't know you don't

17   work for Homeland Security or anything like that.

18   A.    Right.

19   Q.    Okay.  One of the ways in Nigeria, for example, is that

20   someone can be part of a lottery to become a permanent resident,

21   and then, after a certain amount of time living here as a

22   permanent resident can apply to become a citizen outside of being

23   married.  You're aware of that --

24   A.    Yes, sir.

25   Q.    -- avenue?  Okay.

1        But with -- and then, with respect to -- just one thing

2   I noticed.  With the codefendants, Mr. -- or one of the

3   codefendants who's here today, how do you pronounce his name?

4   I'm sorry.  It's Mr. Obaretin?

5   A.   Mr. Obaretin?

6   Q.   Mr. Obaretin.  You had an actual passport with his photo

7   on it.  It was introduced into the record.  But is there a

8   similar passport with my client's photo on it that the

9   government has?

10  A.   We obtained a copy of a copy from a UPS store here in

11  Austin.  It's -- the image isn't as clear as the other passport

12  that was entered into evidence, but it does appear to have a

13  picture of Mr. Imoe on the passport in the name of Frederick

14  Johnson.

15  Q.   Okay.  And was there surveillance at the UPS store?  Any

16  surveillance of people entering there?

17  A.   We have not obtained any images from the UPS store.  No,

18  sir.

19  Q.   Okay.  I think that's all the questions I have.

20          THE COURT:  All right.  Thank you, Mr. Woodcock.

21          Mr. Morris.

22          MR. MORRIS:  Very briefly, your Honor.

23          THE COURT:  Sure.

24          MR. MORRIS:  Thank you.

25

1                        CROSS-EXAMINATION

2   BY MR. MORRIS:

3   Q.   Agent Johnson, Mike Morris on behalf of Mr. Obaretin.

4            Couple of quick questions.  The dates you said on the

5   photos, Exhibits 1 through 5, that were submitted to the Court,

6   especially 2 through 5 that were in Bank of America, do you know

7   what those dates were?

8   A.   I can give you a general answer I referenced on the back of

9   those images.  I could be specific --

10  Q.   If you wouldn't mind, please.  Thank you.

11  A.   Yes.  Government's 2 is May 29th of 2015.  This was a

12  transaction under the David Smith account.  Exhibit 3, October

13  29th, 2014, that was a transaction under the Thabo Nelson

14  account.  Exhibit 4, February 28th of 2015, also a Thabo Nelson

15  transaction.  And Exhibit 5, December 1st of 2014, on the Thabo

16  Nelson account.

17  Q.   Very good.

18           You have no photos, no evidence, no documentation to

19  provide the Court of any illegal activity involving my client in

20  this Augustine Ikolo or this conspiracy after May 2015.  Is that

21  an accurate statement?

22  A.   Yes, sir.  Not at this time.  I don't have any --

23  Q.   Almost two years ago, right, since this?  When was

24  Augustine Ikolo arrested?

25  A.   He was arrested in or about August or September of 2015.

1    Q.    Okay.  And when did he sit down with the government to

2    cooperate and provide testimony against both of these defendants,

3    generally the timeframe?

4    A.    Oh, shortly thereafter.

5    Q.    August, September 2015?

6    A.    Possibly October, yes.

7    Q.    Okay.  So 18 months ago, you knew about these two

8    defendants, their activities, you had the evidence about their

9    involvement, and yet, nothing happened until here we are in

10   January and February of 2017, right?

11   A.    That's correct.

12   Q.    And no subsequent criminal activity between there and then

13   that you're aware of.

14   A.    Not that I'm aware of.

15   Q.    Okay.  Are you aware of -- you indicated that Mr. Ikolo has

16   a wife and she was here in the courtroom, right?  Ms. Vera Ikolo?

17   A.    Yes.

18   Q.    Are you aware that she has an active pending divorce against

19   Mr. Ikolo?

20   A.    I am not familiar with the divorce.

21   Q.    You don't know one way or the other.

22   A.    No, sir.

23   Q.    For what you've characterized, I think, as a sham marriage,

24   right?

25   A.    I believe that was Mr. Ikolo.

```
1   Q.    His characterization?

2   A.    His characterization.  Yes, sir.

3   Q.    Very good.  Thank you, your Honor.

4             THE COURT:  Thank you, Mr. Morris.

5             Any followup, Mr. Galdo.

6             MR. GALDO:  Just very briefly.

7             THE COURT:  Sure.

8                    RE-DIRECT EXAMINATION

9   BY MR. GALDO:

10  Q.    Just one followup on the issue of -- in August or October of

11  2015, all of the evidence in this case had not been collected.

12  There was a -- I just want to make sure that was clear.  There

13  was a question about whether he had all the evidence in 2015.

14  Bank accounts were still being gathered, records were still being

15  gathered, and other defendants were still being identified,

16  correct?

17  A.    Correct.

18  Q.    All right.  And in terms of the sham marriage, there's a

19  question about that.  They were living at different residences,

20  correct?  There was different apartments that Mr. Ikolo and Vera

21  Ikolo were living at when we served search warrants on their

22  homes?

23  A.    That's my understanding.  Yes.  Yes, sir.

24  Q.    Nothing further, your Honor.

25             THE COURT:  Anything else, gentlemen?
```

```
1              MR. MORRIS:  No, your Honor.

2              THE COURT:  Yeah.  No.  Come on up.

3              MR. WOODCOCK:  Just briefly.

4                    RE-CROSS EXAMINATION

5  BY MR. WOODCOCK:

6  Q.   I just wanted to clarify the account information.  When --

7  I'm sorry.  Let me step back.

8              My client, Mr. Imoe, what were the -- what was the last

9  date that he had anything to do with the alleged account in the

10 indictment, to your knowledge?

11 A.   I can speak to these two, Government's 6 and 7 were both in

12 July of 2015.

13 Q.   July of 2015?

14 A.   Yes, sir.

15 Q.   And you're not aware of him -- are you aware of him engaging

16 in any other related illegal activity since that time?

17 A.   Well, I'm not sure what timeframe this account was closed by

18 the bank, so there may be some activity after this date.

19 Q.   Okay.

20 A.   But I would be willing to say it was in 2015, as well.

21 Q.   Okay.  And with respect to you mentioned that my client

22 introduced Ms. Ikolo to Mr. Ikolo.  Were you aware that the two

23 of them worked together -- my client worked actually with Ms.

24 Ikolo at a nursing home?

25 A.   I was aware that they were associated on some level, your
```

1   client and Mrs. Ikolo.

2   Q.   Okay.

3   A.   And that your client made the introduction between Mrs.

4   Ikolo to Mr. Ikolo.

5   Q.   But beyond that, as far as these allegations that that

6   marriage was a sham marriage, is there any evidence that my

7   client had anything to do with setting up the -- other than

8   making an introduction of a coworker?

9   A.   I can't speak to that at this time.  I don't have enough

10  facts to state anything further.

11  Q.   Okay.

12  A.   Other than an introduction.

13  Q.   So the introduction is the only fact that we know as far as

14  his -- my client's activities as related to this alleged sham

15  marriage.  Is that an accurate statement?

16  A.   Yes, sir.

17  Q.   Okay.  Thank you, Judge.

18            THE COURT:  All right.  Thank you, Mr. Woodcock.

19            Anything else by anybody?

20            MR. GALDO:  No, your Honor.

21            THE COURT:  All right.  You can step down.  Thank you.

22            THE WITNESS:  Thanks.

23            THE COURT:  Mr. Galdo, do you have any additional

24  evidence?

25            MR. GALDO:  Government rests on that testimony and the

1   indictment and the Pretrial Service report.

2           THE COURT:  All right.  All of which I'll take judicial

3   notice of it unless there's some type of objection.

4           Starting, again, with Mr. Woodcock, do you have any

5   evidence you'd like to present?

6           MR. WOODCOCK:  No evidence.

7           THE COURT:  All right.  And, Mr. Morris?

8           MR. MORRIS:  May I present two quick evidence -- two

9   quick witnesses, your Honor?

10          THE COURT:  Of course you can.

11          MR. MORRIS:  Thank you.

12          THE COURT:  And the only thing I would recommend that

13  you do as it relates to Ms. -- is it Ikolo?

14          MR. MORRIS:  Yes, your Honor.

15          THE COURT:  If she's one of your intended witnesses,

16  I'd like you to -- I'm not going to do it here in court, but tell

17  her about her Fifth Amendment rights against incrimination.

18  Based on what I heard from the special agent, she sounds like she

19  may have some issues.  So.

20          MR. MORRIS:  Can I -- I will admonish her out in the

21  hall after my first witness testifies, your Honor.

22          THE COURT:  Of course.  Yes.

23          MR. MORRIS:  Thank you very much.

24          THE COURT:  Ma'am, if you'd come forward, please.  And,

25  Mr. Morris, can you help her get to the witness chair?

1           MR. MORRIS:  Your Honor, may I remove an exhibit or

2     just give them to the Court?

3           THE COURT:  Sure.  Yes.  If you would just give them to

4     Ms. Williams.

5           Yes, ma'am.  If you'd make your way around that wall

6     there.  And then, initially before you sit down, if you'd raise

7     your right hand, you're going to be sworn by the clerk.

8           (Witness sworn.)

9           THE COURT:  Ma'am, if you'd have a seat there, make

10    yourself comfortable.  And then, when you're ready, give us your

11    full name and spell your last name for us, please.

12          THE WITNESS:  Oh, my name is Queen Ifah.  Last name,

13    I-F-A-H.

14          THE COURT:  And, ma'am, can you grab that microphone

15    and get it a little closer?  There you go.  Thank you.  All

16    right.

17          Mr. Morris, go ahead.

18          MR. MORRIS:  Thank you very much.

19          QUEEN IFAH, called by the Defendant, duly sworn.

20                        DIRECT EXAMINATION

21    BY MR. MORRIS:

22    Q.   Ms. Ifah, how do you these two gentlemen sitting to my left,

23    your right?

24    A.   I'm Peter's uncle's wife, Roland Peter.

25    Q.   Okay.  So Peter's uncle --

1  A.   I'm married to uncle, yeah.

2  Q.   -- Peter is Roland here, right?

3  A.   Uh-huh.

4  Q.   And then, Bright sitting over here, how do you know him?

5  A.   We've been together in Africa before he came down here, and

6  we introduced him to Peter.

7  Q.   Okay.  Very good.

8  A.   So they are staying together.

9  Q.   And what part of Africa did you -- were you living in at the

10  time?

11  A.   Nigeria.

12  Q.   Nigeria.  Very good.  So all of the people we're talking

13  about so far are from Nigeria?

14  A.   Yeah.

15  Q.   Correct?

16  A.   Yeah.

17  Q.   When did you come to Austin, Texas?

18  A.   When did I come here?

19  Q.   Yes, ma'am.

20  A.   2009.

21  Q.   2009?

22  A.   December, yeah.

23  Q.   Were Peter or Bright living here at that time?

24  A.   Yeah.  Peter was here.

25  Q.   But not Bright yet.

```
 1  A.    Peter was still with my husband before I came here.
 2  Q.    Okay.
 3  A.    And he was staying with uncle.
 4              THE COURT:  Point of clarification, who is Peter?
 5              THE WITNESS:  Roland Peter.
 6              MR. MORRIS:  Roland.  He goes by Peter, your Honor.
 7  Sorry, that's how she'll be identifying him.  And then, Bright is
 8  my client --
 9              THE COURT:  Got it.  Okay.
10              MR. MORRIS:  -- if that's all right.
11  Q.    (BY MR. MORRIS) Can you tell me what Bright does here in
12  Austin for work when he arrived from Nigeria?
13  A.    We worked together at the Austin Support Living Center.
14  Q.    Austin State Hospital?
15  A.    No.  Austin Support Living Center.
16  Q.    Okay.
17  A.    They have the Living Center and they have the hospital.
18  Q.    And you were working in the Living Center.
19  A.    I am still there right now.
20  Q.    Still there?
21  A.    Uh-huh.
22  Q.    And you worked with Bright there for how long?
23  A.    We worked for about two years.
24  Q.    Okay.  Did he go to school or did he get any college
25  education that you're aware of while he was here?
```

1   A.   When he quit the job, he was going to school.

2   Q.   At ITT Tech?

3   A.   Yes.  His school was shut down.

4   Q.   And that school was shut down, right?

5   A.   Yeah, yeah, yeah.

6   Q.   So he couldn't be there anymore.  When he was arrested in

7   this case, what work was he doing at that time, do you know?

8   A.   He drive -- he's a driver.

9   Q.   Driver for Fasten, Get Me?

10  A.   Fasten, yeah.  Fasten, uh-huh.

11  Q.   And four or five other companies like Uber and Lyft and all

12  those kinds of companies, right?

13  A.   Yes.  Uh-huh.

14  Q.   Okay.  How often would he work?  How many days of the week?

15  A.   He works almost every day.

16  Q.   Okay.

17  A.   Uh-huh.

18  Q.   How much contact did you have with Bright while he was here

19  and working during this last six months?

20  A.   I do visit him.  He always come to my house.  You know, at

21  times, he spent two, three days at my house.

22  Q.   Okay.

23  A.   Yeah.

24  Q.   How tight --

25  A.   I'm like a mother.

1   Q.   His mother?

2   A.   More like a mother to him, yeah.

3   Q.   How tight is the Nigerian community here in Austin?

4   A.   We are very close.

5   Q.   Very close?

6   A.   Very, very close.

7   Q.   Okay.  So you know everybody involved with Mr. Bright and

8   Peter?

9   A.   Yes.

10   Q.   Okay.  Who's coming this Friday?

11   A.   Who's coming?  Oh, that is Bright's wife.

12   Q.   Who's coming to see him for the first time here in the

13   United States, right?

14   A.   That is Bright's wife is coming.  Ashley is the name.

15   Q.   Ashley?

16   A.   Uh-huh.

17   Q.   Okay.  Where did Bright go in January of this year on a

18   plane?  Did he go visit Ashley in Nigeria?

19   A.   Yeah.  In Nigeria, yeah, yeah, yeah.  Uh-huh.

20   Q.   To visit his wife?

21   A.   Yes.

22   Q.   Do you know how long they've been married?

23   A.   They're going to, I think, one year.

24   Q.   A year?

25   A.   Yeah.

1   Q.   Okay.

2   A.   I think a year.

3   Q.   And then, she's coming over this Friday, do you know why?

4   Is it a visit or just a chance to --

5   A.   She's coming to stay.

6   Q.   She's coming to stay?

7   A.   Yeah.

8   Q.   And live here in the United States?

9   A.   Yes.

10   Q.   Okay.  And do you know if she has lawful permanent resident

11   status, as well?

12   A.   Uh-huh.  Yes.

13   Q.   Okay.  Very good.  Do you know why Mr. Bright is no longer

14   in college classes?  I mean, we talked about ITT Tech shutting

15   down, but that was a little while ago.

16          Do you know why he's not in college classes now?

17   A.   No.

18   Q.   Okay.  He never talked to you about that?

19   A.   I didn't ask him.

20   Q.   Okay.  Very good.

21          And do you know Augustine Ikolo?

22   A.   Ikolo, no.

23   Q.   Do you know Vera Ikolo?

24   A.   Yeah.  I know Vera.

25   Q.   Who is her husband?

```
 1   A.   I don't know the husband, but I know Vera as a friend.  We
 2   are just friends.
 3   Q.   Okay.  Gotcha.  So you don't know Vera as well as you know
 4   these two.
 5   A.   No, no.
 6   Q.   Have you ever known either Peter or Bright to get in trouble
 7   here in Austin or do anything against the law?
 8   A.   Uh-huh.
 9   Q.   Have you ever known them to do that?
10   A.   No, no, no, no, no.
11   Q.   Never that you're aware of.
12   A.   No.
13   Q.   Okay.  Very good.  I pass the witness, your Honor.
14                        CROSS-EXAMINATION
15   BY MR. GALDO:
16   Q.   Good morning, ma'am.
17   A.   Good morning.
18   Q.   Ma'am, are you a -- you're from Nigeria.
19   A.   I'm from Nigeria.
20   Q.   Are you from Ore?
21   A.   Yes.  No.  I'm from Benin.
22   Q.   Benin.  Okay.  And where is --
23   A.   Benin is in Edo state.
24   Q.   In Edo state.  And where is Mr. -- I think it's -- keep
25   calling him Bright.  Mr. Obaretin?
```

```
 1   A.    Oh, they are from Edo state.

 2   Q.    Edo state.  And where in Edo state?

 3   A.    Edo state in Benin City.

 4   Q.    Benin City.  And they're -- both Mr. Imoe and Mr. Obaretin

 5   are from there.

 6   A.    Yes.

 7   Q.    Okay.  And you talked about Mr. Obaretin's wife.  Were they

 8   married in Italy or in Nigeria?  Where did they get married, do

 9   you know?

10   A.    In Nigeria.

11   Q.    They were in Nigeria?  And how long have you known Vera?

12   A.    I only like know her "hi, hi," you know.  I don't know her

13   house, I don't know anything about her.  But I know at times, she

14   visit Peter, and when I visit Peter, I meet her there.

15   Q.    Okay.  So you've seen her, but you never saw the person that

16   she is leg -- was married to.

17   A.    No.  I don't know.

18   Q.    Okay.  And I'm sorry, could you spell your first name for

19   me?  I got your last name, I-F-A-H.  What's your first name?

20   A.    My first name is Q-U-E-E-N.

21   Q.    Queen.  Okay, not Quin.  Sorry, I heard Quin.  Thank you.

22         One moment, your Honor.  I'll pass the witness, your

23   Honor.

24         THE COURT:  Mr. Woodcock, do you have any questions

25   you'd like to ask?
```

1          MR. WOODCOCK:  I guess I could ask just a few.

2                       CROSS-EXAMINATION

3   BY MR. WOODCOCK:

4   Q.   Ma'am, so you know my client Rol -- you're calling him Peter

5   because it's his middle name; is that correct?

6   A.   Yeah.

7   Q.   His name is Roland Peter Imoe?

8   A.   Uh-huh.

9   Q.   And you are married to his uncle.

10  A.   Yes.  I'm married to his uncle.

11  Q.   And his uncle lives here in town?

12  A.   Yes.

13  Q.   Along with you.

14  A.   Yes.  We stay together.

15  Q.   Okay.

16  A.   He's my husband.

17  Q.   All right.  And so, you see Peter frequently?

18  A.   Yes.

19  Q.   How long have you -- how long have you lived in Austin?

20  A.   How long I've been in Austin?

21  Q.   Yes, ma'am.

22  A.   For seven years.

23  Q.   Seven years.

24  A.   Uh-huh.

25  Q.   And Peter's lived here the entire time?

```
 1  A.   Yes.
 2  Q.   That you've been here, you've interacted with him that prior
 3  time?
 4  A.   When Peter came here, he was still with the uncle.
 5  Q.   Okay.  He was living --
 6  A.   Yes.  He was living with the uncle.  Before the uncle got
 7  apartment for him.
 8  Q.   His uncle is your husband.
 9  A.   Yes, my husband.
10  Q.   So that was before you were married to him.
11  A.   Yes.
12  Q.   Okay.  And during that entire time, have you known him to
13  get in trouble at all?
14  A.   He has never been in trouble.
15  Q.   Okay.  And was this lady, Vera Ikolo?
16  A.   Vera is just a friend to Peter.  They work together at the
17  Heritage Park.
18  Q.   Okay.
19  A.   It's a living center.
20  Q.   Okay.  So you've seen her a couple of times because he
21  worked with her.
22  A.   Yes.  Uh-huh.  He's a good friend to Peter.  He is.  They
23  are coworkers; they work together.
24  Q.   Okay.  Thank you, ma'am.
25  A.   You're welcome.
```

1            MR. MORRIS:  Nothing further, your Honor.

2            THE COURT:  All right.  Thank you for coming, ma'am.

3     You could step down.

4            Is there any objection to her remaining in the

5     courtroom?

6            MR. GALDO:  No, your Honor.

7            THE COURT:  All right.  Ma'am, you could stay in the

8     courtroom.

9            MR. MORRIS:  Your Honor, if you'll allow me to proceed

10    just real quickly by proffer as to what Vera Ikolo would say.

11           THE COURT:  That's going to be up to Mr. Galdo.

12           MR. MORRIS:  I agree.  I'm just going to tell him what

13    I would proffer so he could see if he contests it.  I don't think

14    he will.

15           THE COURT:  He might not.  Go visit.  He's a nice guy

16    sometimes.

17           MR. MORRIS:  Thank you, your Honor.

18           MR. GALDO:  Those three things don't bother me.  I'm

19    going to say those three things, that's fine.

20           MR. MORRIS:  That would be the proffer I would offer

21    the Court.

22           THE COURT:  Very good.  I'm glad you two gentlemen were

23    able to visit.

24           Mr. Morris, do you have a proffer for us?

25           MR. MORRIS:  I do, your Honor.

1          THE COURT:  And before we do that, do you have -- do

2    you intend to call the other two people that are out in the

3    hallway?

4          MR. MORRIS:  I do not, your Honor.

5          THE COURT:  All right.  Mr. St. George, you can tell

6    those kind people that they can come back in the courtroom if

7    they'd like.  All right.

8          Mr. Morris, your proffer.

9          MR. MORRIS:  Thank you, your Honor.

10         I believe that Vera Ikolo, if she was called to

11   testify, we would ask her three questions and these would be her

12   answers.  We would ask her what the status has been of the

13   relationship between Augustine Ikolo, her husband, and the

14   Nigerian community, and she would testify that since August --

15   July, August 2015, the entire community has shunned him.  He was

16   arrested, she's filed a divorce.

17         The second thing we would ask her would be about her

18   ability and knowledge of Mr. Bright and his ability to come live

19   with her if the Court needed someone to vouch for him and say

20   that he could come and be there at that time.  And that there is

21   actually -- the third thing would be that there is actually a

22   pending divorce between Vera Ikolo and Augustine Ikolo.  Those

23   would be the three things we would say, your Honor.

24         THE COURT:  Very good.  And I take it there's no

25   objection, Mr. Galdo.

1          MR. GALDO:  No, your Honor.  I'll save us the --

2          THE COURT:  Yes.  And, Mr. Morris, do you have any

3    additional evidence you'd like to present?

4          MR. MORRIS:  I have no additional evidence.

5          THE COURT:  All right.  Well, that closes the

6    evidentiary portion of our hearing.

7          Mr. Galdo, do you have any argument you'd like to make

8    on your motion?

9          MR. GALDO:  Yes, your Honor.

10          I guess I would begin by acknowledging there is

11    somewhat of a different -- a differentiation between these two

12    defendants because of their citizenship status as of right now.

13    I think there is at least some argument in our opinion for Mr.

14    Imoe.  I don't think it's a winning one, but I will acknowledge

15    that he is a citizen.  I think one of the strongest reasons to

16    flee is, basically we call it, self-deportation for Mr. Obaretin.

17    If he's out, I don't know if, in good conscience, if I was his

18    attorney, I could say he should stay and face these charges.  He

19    should just go home because he's probably going to get deported

20    at the end of this case.  So why go to jail and get deported when

21    you can just go back to Nigeria.

22          The Court knows there's -- it's Nigeria.  We've been

23    through this issue before in terms of extradition.  It's not like

24    we can reach out and send our agents to go pick him up.  So I

25    think that's a serious risk for Mr. Obaretin that he will flee.

1   Compounding that -- and I would say this for both defendants --

2   is, as the Court heard testimony, the fake passport, we don't

3   have any testimony about whether it's good enough to travel on,

4   but it certainly is good enough to open a mailbox, open a bank

5   account in a totally fake name with no connection to anything,

6   move to Atlanta, open a bank account, get an apartment, get a

7   mailbox, start a life under a fake name.  All we could do is pray

8   that they get caught and their fingerprints get run.  They could

9   start a whole new life.  That gives us serious concern for both

10  defendants.

11          And then, the other option is simply cross the border

12  into Mexico, get a flight with your Nigerian passport, go back to

13  Nigeria.  As the Court knows, GPS monitors are not like invisible

14  dog fences where you get shocked if you go outside of an area.  I

15  mean, we get notice the next day that they're in Mexico, and

16  then, maybe we get some records from international flights that

17  they flew to Europe, and then, we lose them.

18          So those are our main concerns.  I'll be honest, I

19  don't have any evidence that either of these individuals is going

20  to harm any witnesses or anything along those lines.  It really

21  comes down to whether they'd come back.  I was troubled by the

22  use of Vera Ikolo as the verifying person, the spouse of a

23  coconspirator in this case, who, our evidence is, entered into a

24  fake marriage so that Mr. Ikolo could get status here.  They were

25  living at different residences when Mr. Ikolo was arrested.  We

1  don't believe that marriage was ever genuine.  So in terms of the

2  Court relying on Vera Ikolo to vouch for these two individuals,

3  the government has serious concern about that.

4        I just don't believe with their proven ability to have

5  access to fake passports and Mr. Obaretin's LPR status and both

6  of their strong ties to Nigeria that a bond is appropriate in

7  this case.

8        THE COURT:  All right.  Thank you.

9        Mr. Woodcock.

10        MR. WOODCOCK:  Yes, your Honor.

11        The Court has the Pretrial Services report in front of

12  it, and they are recommending at least for my client that he be

13  released under a $50,000 -- a ten percent, $50,000 bond.  He is a

14  citizen and there was some discussion he became a citizen because

15  of a fraudulent -- but I don't think there's -- the agent

16  admitted there was absolutely no -- he is unaware of any evidence

17  that that was a fraudulent marriage.

18        And, you know, there's no evidence -- there are other

19  ways to become a citizen.  For example, you can -- which is

20  actually the case in this case, you can get a lottery from

21  Nigeria and become a permanent resident and -- is my

22  understanding is how he became a citizen, and the marriage had

23  nothing to do with that.  But that aside, the fact that he has

24  strong ties in Nigeria I don't think is an indication that he's

25  going to leave and give up his United States citizenship, which

1   even were he convicted of the -- he's not going to lose his

2   citizenship is if he's convicted of these -- this offense.

3          And the fact of the matter is, Judge, that he can make

4   far in excess the income here than he would be able to make in

5   Nigeria.  The fact that he has strong ties there is an indication

6   that he would want to stay here, continue to make money to send

7   back and, you know, support family and bring family members here,

8   which is actually his plan.  His young child and wife that he has

9   over in Nigeria.  And so, his travel there has been to visit

10  those people.

11         And he's working hard as an immigrant with -- I think

12  there's listed four different jobs, you know, as a driver.

13  Certainly if the allegations made against him of -- in this

14  indictment prove to be true, he certainly made a mistake, but I

15  don't -- you know, the serious one which he's going to have to

16  perhaps eventually, if it can be proven and once we've review the

17  evidence, you know, he's going to have to take responsibility for

18  that.  But I don't think -- there's been no other evidence that

19  he poses any kind of danger to the community.

20         And, you know, the fact that it is possible to return

21  to Nigeria I don't think is enough to justify -- overcome the

22  presumption that as a citizen of the United States that he would

23  not stay here and return back to court.

24         I do think, given the fact, you know, he works four

25  jobs and he does have some income, I -- my only kind of

1    disagreement with the recommendation of Pretrial is that he be

2    required to post this $50,000 bond.  That would mean he would

3    have to come up with $5,000, which I don't -- isn't -- he doesn't

4    have a lot of cash on hand.  He has a credit card.  He's told me

5    that he could maybe use some of it toward that $5,000.

6            But we would ask that we have no, you know, argument

7    with any of the other conditions that Pretrial is recommending,

8    you know, that his passport be taken away, that he not be allowed

9    to travel outside of Travis, Hays and Williamson County, that

10   report and not have contact with any of the other victims or

11   defendants in this case.  We would just ask that he be given just

12   a pretrial bond to return, Judge.

13           I would point out that as far as with the issue of Vera

14   who is -- Ms. Vera Ikolo, we have not presented her as being a

15   verifying witness for her at all.  We're just going to rely on

16   Pretrial's recommendation.

17           THE COURT:  Thank you, Mr. Woodcock.

18           Mr. Morris.

19           MR. MORRIS:  Thank you, your Honor.

20           For the last 570 days, these two gentlemen have known

21   that Augustine Ikolo was arrested, cooperating, and giving the

22   government every piece of information about them necessary.

23   What's kept them here for the last year and a half that would

24   change today?  What flight risk did they not have in December of

25   2016 and November and October and September that they now

1  possess?  Just the fact that they've been arrested because, quite

2  frankly, when you surrender your passport, which would be a

3  condition of probation and pretrial release, there is not a

4  flight risk for getting on an international flight.  They were

5  providing, as the government's cooperating witness well knows as

6  he testified to them in August of 2015, he provided them those

7  fake passports.  Neither of these gentlemen create -- there's no

8  evidence they've ever created fake passports.  That was provided

9  by the government's cooperating witness.

10        So what we have here is an argument that somehow these

11  two gentlemen are a flight risk outside the scope of norm because

12  this isn't a presumption case.  This isn't 40 years in drugs and

13  nobody's going to come out without a mandatory minimum.  This is

14  a financial crime case.  This doesn't fall within the pale of

15  what we would normally consider a detention case, I think.

16        The one difference correctly pointed out, I think, by

17  Mr. Galdo, is that when you are a lawful resident permanent

18  status, this could jeopardize that.  That's true.  But the

19  Federal Circuits haven't automatically said that just because you

20  have an ICE detainer and because you have some potential for

21  violations of that, that you automatically become a flight risk.

22  Fact is, the case law's quite to the contrary.

23        The case law that I was looking at this morning was

24  United States vs. Santo Flores, 794 F. 3d 1088, 2015 case.  That

25  case says there's got to be an element of volition.  You have to

1   have some indication of volition for a defendant to be indicated

2   as somebody outside the pale of all people who are here lawfully

3   but without citizenship.  There's been no evidence.

4           Fact is, the only evidence that Mr. Galdo can provide

5   you is that the presumption, the assumption that somehow being on

6   lawful resident status means that he will flight.  That all the

7   evidence provided and to vouch like Queen Ifah made it very

8   clear, he wants to go to school.  His wife is on her way to meet

9   him here to begin a new family in the United States, and she's on

10  lawful permanent status, as well.  They are going to create a new

11  family here in Austin.

12          Even now, or a year from now, when their finances are

13  zero and the ability to create a new life would not exist,

14  working every day, how much trouble, how much risk is he to be a

15  flight risk?  And we would propose that the standard conditions

16  that are put in place would be viable to be able to ameliorate

17  that and take away any sting for this court having any trouble

18  with that concern.  Thank you.

19          THE COURT:  Thank you, Mr. Morris.

20          Mr. Galdo, both the lawyers make good points, but Mr.

21  Morris makes the point that I'm wrestling with is, I got an

22  indictment where it represents probable cause to believe that

23  they're involved in a scheme that extends from 2012 to 2016 at

24  some point.  But the evidence I heard, you only have these guys

25  involved in a couple of discrete points back in 2015, and they've

1 come and gone to Nigeria.  And Mr. Ikolo is kind of -- he's now

2 been ostracized from the community because everybody knows he has

3 the audacity to cooperate with the prosecutors.  But that's a

4 good argument.

5          MR. GALDO:  I would just say it's news to me that they

6 knew from when he was arrested that he was cooperating.  I don't

7 think there was any evidence that they presented to your Honor

8 that they knew he was cooperating.

9          THE COURT:  That's true.

10          MR. GALDO:  And so, that's an assumption.  I'd be very

11 intrigued to follow up how they found out about that that we

12 maybe inquire.

13          In terms of the time being a flight risk or not, that's

14 the main difference.  Being under indictment versus not being

15 under indictment.  Knowing that you're being charged with an

16 offense, especially for Mr. Obaretin, that means there was a very

17 good chance you are not going to stay here in the United States.

18 That's just a fact.  That puts him at a very different situation

19 than he was before.

20          In terms of their involvement, I think as the testimony

21 that we elicited today was about multiple times that they

22 accessed these bank accounts.  In terms of their time in the

23 conspiracy, as stated in the indictment and has been brought out

24 here today, it's true for this particular conspiracy, we have not

25 presented evidence that after Mr. Ikolo was arrested in late

1  2015, they were involved.  You did hear evidence that they were

2  involved as far as back as 2014 in this case.

3          And the combination of fake passports, especially for

4  Mr. Obaretin plus immigration status being in jeopardy is

5  definitely an issue.  For Mr. Imoe, I will acknowledge that he is

6  in a bit of a different situation because his citizenship status

7  is not at issue.  I don't think that's a fact that can be

8  ignored.  I'm not as familiar with the case that counsel just

9  cited in terms of immigration status alone.  If I remember that

10  case, that was literally where someone just referenced

11  immigration status.  There's been more facts brought before the

12  Court than just someone's immigration status.

13          So with the combination of fake passports, plus close

14  ties to Nigeria, plus with Mr. Obaretin the immigration status,

15  we believe there's enough to detain them.

16          THE COURT:  All right.  Messrs. Obaretin and Imoe, I

17  think I told you the other day when I -- you asked for appointed

18  lawyers, that I would appoint good lawyers and I have done that.

19          Messrs. Morris and Woodcock, I want to thank you for

20  accepting the appointments.  I see Mr. Cluck out there, I want to

21  thank you, as well, sir.  These are good lawyers and they do

22  their best for you now.  They've done that today and will in the

23  future.

24          Gentlemen, you're entitled to be released on the least

25  restrictive conditions that I could craft that can provide for

1  your appearance in court.  Unfortunately, gentlemen, I'm going to

2  order that you be detained pending further proceedings in this

3  case.  The reason for this, quite simple for me, is you both got

4  here to the United States, Mr. Obaretin, when he was 26 years old

5  and, Mr. Imoe, when you were 28, and within a short period of

6  time, you managed to adopt the identity of people, fictitious

7  people, and then, go to financial institutions and play your part

8  in an elaborate scheme that defrauded not only U.S. citizens but

9  people abroad.

10        In other words, the scheme with which you were involved

11  in isn't one from a bunch of knuckleheads at South Austin.  Your

12  scheme crossed state lines, crossed international boundaries.

13  Your community is obviously close.

14        And there's different kinds of flight.  Everybody wants

15  to say, oh, it's flight about, oh, they're going to go cross the

16  world and we'll never see them again.  But there's flight you can

17  go cross the world, wait a year, and then, come back after most

18  of the case is disposed of, and then, your defense, frankly, is

19  much better if you just simply delay your appearance.

20        Another type of flight is just to go secret yourself in

21  another American city for a while.  I don't know what you might

22  do, but I do know this:  With a short period of time after

23  getting in the United States of America, yeah, you've worked, but

24  you've also managed to get involved in an elaborate fraud scheme

25  that's described quite -- in quite detailed -- in a quite -- in a

1   detailed manner in the indictment.

2            So just to sum up, I'm going to order your detention

3   based on the nature of the offense, the lack of serious family

4   ties.  I mean, I've read all these Pretrial Services reports, and

5   I know there's been no evidence of marriage fraud, but I gotta

6   tell you, it sure kind of looks like every single one of these

7   defendants in this case, there's something going on with regard

8   to the marriages.  But it speaks to a lack of ties to the Austin

9   community, serious work or investment in employment, significant

10  ties to a foreign country, and the lack of significant

11  verification of -- frankly, of any of this.

12           So that's what I'm going to do.  I'm going to enter

13  those orders by the end of the day.  And, otherwise, we're

14  adjourned.

15           (Proceedings conclude at 11:05 a.m.)

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                          REPORTER'S CERTIFICATE

6

7     I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING WAS

8   TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE TIME OF THE

9   AFORESAID PROCEEDINGS AND IS A CORRECT TRANSCRIPT, TO THE BEST OF

10  MY ABILITY, MADE FROM THE PROCEEDINGS IN THE ABOVE-ENTITLED

11  MATTER, AND THAT THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE

12  PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE UNITED

13  STATES.

14

15  /s/Lily I. Reznik                  April 21, 2017

16  LILY I. REZNIK                     DATE

17

18

19

20

21

22

23

24

25